UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
                                    )
UNITED STATES OF AMERICA            )
                                    )
    v.                              )   CR. No. 05-cr-10115-JLT
                                    )
JOSE ORTIZ-PEREZ                    )
                                    )
_____)

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS
ELECTRONIC AND WIRE INTERCEPTIONS**

I.   *Introduction*

Defendant Jose Ortiz-Perez is entitled to suppression of all wire interceptions from and after February 4, 2005 in this case, as well as all evidence derived therefrom, because the constitutional and statutory requirements to obtain authorization to intercept electronic and wire communications require a showing by the applicant that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §§2518(1)(c) & (3)(c). In this case, that showing was not met.

Three intercept orders were issued in the course of the investigation leading to this indictment, an original order and an extension covering mobile telephone number 508- 863-3411, ("Ofarrill cellphone") dated, respectively, February 4, 2005 and March 4, 2005, and an order covering mobile telephone number 774-253-6830 ("Morales cellphone"), dated March 21, 2005. Ortiz-Perez has moved to suppress interceptions made pursuant to all three of these orders, the later two as derived from information obtained as a result of the original order, and further moves to suppress any evidence derived from the interceptions, which in particular includes evidenced seized from in a vehicle stop and search conducted on March 21, 2005, by Massachusetts State Police, on

Interstate 95 north of Attleboro.

II.   *Title III Overview*

The Government's ability to investigate suspected illegal activity with electronic surveillance is strictly limited by constitutional guarantees of privacy and right to freedom from overly intrusive governmental searches and seizures. *Berger v. New York*, 388 U.S. 41 (1967); *Katz v. United States*, 389 U.S. 347 (1967). "By its very nature eavesdropping involves an intrusion on privacy that is broad in scope [and] . . . 'indiscriminate use of such devices in law enforcement raises grave constitutional questions under the Fourth and Fifth Amendments,' and imposes a 'heavier responsibility on this Court in its supervision of the fairness of procedures[.]'" *Berger*, 388 U.S. at 56 (citing *Osborn v. United States*, 385 U.S. 323 (1966)).

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. § 2510 *et seq*, prohibits the interception of electronic, wire and oral communications except under carefully delineated circumstances and only after securing judicial approval. The Supreme Court in *United States v. Giordano*, 416 U.S. 505, 514 (1974) has explained this requirement:

> The Act . . . imposes important preconditions to obtaining any intercept authority at all. Congress legislated in considerable detail in providing for applications and orders authorizing wiretapping and evinced the clear intent to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications. These procedures were not to be routinely employed as the initial step in criminal investigation. Rather, the applicant must state and the court must find that normal investigative procedures have been tried and failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous. §2518(1)(c) and (3)(c).

416 U.S. at 514-15. The procedural steps set forth in the act were designed to conform to constitutional standards and require strict adherence. Evidence obtained from improperly authorized

eavesdropping applications is not admissible, and must be ordered suppressed. 18 U.S.C. §2518(10).

Because of the breadth of the intrusion on privacy imposed by eavesdropping, the statute requires, *inter alia*, a showing that the intrusion is necessary, because other, less intrusive investigative techniques have either been tried and have failed, or appear likely to fail if tried. 18 U.S.C. §2518(1)(c). Because wiretapping, by its nature entails dispensing with prior or even contemporaneous notice, these requirements set out in the statute serve the purpose of strictly limiting this most intrusive and secretive of searches to situations in which it is necessary. Electronic eavesdropping is intended to be, by the operation of the constitution and Title III, an "extraordinary investigative device." *United States v. Giordano*, 416 U.S. 505, 524 (1974). See *United States v. Hoffman*, 832 F.2d 1299, 1307 (1st Cir. 1987)("[I]n a society which values privacy and the rights of the individual, wiretapping is to be distinctly the exception and not the rule."). See also James G. Carr, The Law of Electronic Surveillance §4.4(d), at 4-70 (2001).

The requirement that searches be no more intrusive than necessary, in the context of monitoring the private conversations of citizens, demands that the showing of necessity be real, not reduced to a rote recitation of the difficulty of investigating a class of crime. Approval of electronic surveillance must not be perfunctorily given whenever a general nod to the difficulty of police work is made in the warrant application.

III.    *Defendant Has Standing to Seek Suppression*

The defendant has standing to seek suppression of the intercepted conversations and evidence derived therefrom. Section 2518(10)(a) permits any "aggrieved person" to move to suppress unlawfully intercepted wire or oral communications. Section 2510(11) defines "aggrieved

3

person" as one "who was a party to any intercepted wire, oral, or electronic communication. . . ."

In the discovery provided by the government, it has included a list of intercepted telephone conversations, together with synopses, of the actual interecepted conversations, in which Ortiz-Perez is alleged to have been mentioned or to have been a party to the conversation. The first conversation in which Ortiz-Perez is identified as a speaker is on February 7, 2005, and was intercepted pursuant to the first order authorizing interception of the Ofarrill cellphone. The last conversations in which Ortiz-Perez is identified as a speaker occur on March 21, 2005, the date of his arrest, and was intercepted pursuant to the second order extending interception authority for the Ofarrill cellphone. Ortiz-Perez is not alleged to have spoken during conversations intercepted from the Morales cellphone but there are conversations allegedly discussing him which the government may seek to introduce in evidence against him.

In this case, the order issued on March 4, 2005 was not based on an adequate showing of necessity from which the issuing judge "'could reasonably have concluded that normal investigatory procedures reasonably appeared to be unlikely to succeed.'" *United States v. Lopez*, 300 F.3d 46, 53 (1st Cir. 2002)(quoting *United States v. Ashley*, 876 F.2d 1069, 1074 (1st Cir. 1989)). This failure rendered the interceptions illegal as a statutory matter and unreasonable as a constitutional matter.

III.  *The Electronic and Wire Interceptions of the Ofarrill cellphone was not Necessary, Because it was not Shown that Normal Investigative Procedures Had Been Tried and Failed or Appeared Unlikely to Succeed if Tried.*aa

As set out above, the government must prove "necessity" before receiving authorization to intercept electronic, wire and/or oral communications. 18 U.S.C. § 2518(3)(c). To ensure that law enforcement authorities do not resort to wiretapping when traditional investigative techniques would suffice, the government is "required to make a reasonable, good faith effort to run the gamut of

4

normal investigative procedures before resorting to means so intrusive as electronic surveillance of telephone calls." *United States v. Ashley*, *supra*, 876 F.2d at 1072 (quoting *Hoffman*, 832 F.2d at 1306-07).

Before an interception order may issue, the "court must satisfy itself that the government has used normal techniques but has encountered difficulties in penetrating or in gathering evidence to a point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable." *United States v. Abou-Saada*, 785 F.2d 1, 11 (1st Cir. 1986); *United States v. Scibella*, 549 F.2d 222, 226 (1st Cir. 1977); *Ashley*, 876 F.2d at 1073. The fact that wiretaps are regularly utilized does not render the application and averment of the unsatisfactory nature of conventional techniques a mere formality. *United States v. Clements*, 588 F.2d. 1030 (5th Cir.), *cert. denied,* 440 U.S. 982 (1979).

At a minimum, to satisfy the necessity requirement, the affidavit must detail a factual predicate to support the affiant's statements that ordinary investigative techniques have not and will not suffice. *See, e.g., United States v. Brone,* 792 F.2d 1504, 1506 (9th Cir. 1986); *United States v. Armocida,* 515 F.2d 29, 38 (3d Cir. 1975); *United States v. Spagnuolo,* 549 F.2d 705, 710 (9th Cir. 1977). Generalizations and boilerplate recitations regarding why traditional investigative techniques have not sufficed or why they would not succeed if tried, do not satisfy the critical necessity requirement, one of the central statutory safeguards against unwarranted invasions of privacy. *See, e.g., United States v. Oriakhi,* 57 F.3d 1290, 1298 (4th Cir. 1995) (government may not make requisite necessity showing through a mere "boilerplate recitation of the difficulties of gathering useable evidence [; r]ather the government must base its need on real facts and must specifically describe how, in the case at hand, it has encountered difficulties in penetrating the criminal

5

enterprise or in gathering evidence with normal techniques to the point where wiretapping becomes reasonable"); *United States v. Ashley,* 876 F.2d at 1072 (bare conclusory statements that normal techniques would be unproductive, based solely on an affiant's prior experience, do not comply with §2518(1)(c)); *United States v. Vento,* 533 F.2d 838, 849 (3d Cir. 1976) (use of boilerplate and absence of particulars in wiretap applications have not been permitted lest wiretapping become established as a routine investigative recourse, contrary to the restrictive intent of Congress); *United States v. DiMuro,* 540 F.2d 503, 510 (1st Cir. 1976) (agent's bare conclusory statement that normal investigative techniques are generally unproductive in dealing with gambling operations insufficient); *United States v. Kalustian,* 529 F.2d 585, 590 (9th Cir. 1976) (affidavit failed to satisfy necessity requirement because it failed to present any information why this gambling case "presented any investigative problems which were distinguishable in nature or degree from any other gambling case); *United States v. Lilla,* 699 F.2d 99, 104 (2d. Cir. 1983) (reject generalized and conclusory statements that other investigative procedures would prove unsuccessful); *Spagnuolo, supra,* 549 F.2d at 710 (affidavit composed solely of conclusions unsupported by particular facts gives no basis for a determination of compliance).

Section 2518(3) imposes upon the court an independent obligation to determine on the *basis of facts submitted by the applicant* that the necessity of recourse to electronic surveillance has been adequately demonstrated. *See, e.g., United States v. Scibelli,* 549 F.2d 222, 226 (1st Cir. 1977); *United States v. Ashley,* 876 F.2d at 1072, 1073 (issuing judge must independently conclude, based upon the affidavit, that antecedent efforts were adequate to comply with §2518 (3)(c)). The necessity requirement "directly and substantially implements the congressional intention to limit the use of intercept procedures to those situations clearly calling for their employment." *United States*

*v. Mondragon,* 52 F.3d 291, 294 (10th Cir. 1995). While it may well be more efficient for the government to engage in wiretapping rather than pursue more time-consuming avenues of investigation such as physical surveillance, "the statutory requirement that other investigative procedures be exhausted before wiretapping reflects a congressional judgment that the cost of such efficiency in terms of privacy interests is too high." *United States v. Lilla*, 699 F.2d at 105 n.7.

> It is no doubt true that experienced agents at the outset of an investigation can anticipate with a fair degree of accuracy whether ordinary techniques will fail or prove to be "too dangerous." To delay the wiretap order while ordinary techniques are employed or to undertake to educate a district judge to enable him to appreciate their level of experience no doubt appears to such agents as a waste of time and resources. Their perception may be accurate, but Congress has deprived it of decisive influence. The particularized showing here described is necessary. The district judge, not the agents, must determine whether the command of Congress had been obeyed.

*United States v. Spagnuolo, supra,* 549 F.2d at 710-11.

The application and affidavit in support of the application submitted on February 4, 2005, to monitor the Ofarrill cellphone failed to demonstrate necessity. To the contrary, the affidavit demonstrated that normal investigative techniques had been remarkably successful, and were curtailed in favor of the more efficient, but far more intrusive, use of wiretaps. This failure requires the suppression of evidence seized pursuant to this authorization and pursuant to the subsequent authorizations to intercept the Ofarrill and Morales cellphones based on the evidence gathered pursuant to the February 4, 2005 order.

In each of the applications for wiretap authorization made in this case, the government referred to the supporting affidavits to supply the necessary facts to show probable cause and necessity. The affidavits for the Ofarrill cellphone were submitted by Special Agent Daniel J. Forde of the U.S. Drug Enforcement Administration. The affidavit for the Morales cellphone was

submitted by Special Agent Andrew R. Simmons. Each succeeding affidavit incorporated its predecessors. The facts allegedly supporting the necessity of electronic monitoring set forth in the February 4, 2005 affidavit are set forth below[1]

A.   *The Investigation*

The affidavit of February 4, 2005 outlined an investigation of Ofarrill and six others, one believed to be a supplier to Ofarrill and the others working under Ofarrill in a heroin distribution network in New Bedford, Massachusetts. ¶9. Information from seven confidential sources was included in the affidavit. DEA had begun an investigation in April, 2004, and had learned that Ofarrill controlled an organization which operated a heroin distribution business with regular business hours, with two stash houses at specified addresses in New Bedford and Providence, Rhode Island. ¶¶12, 13. DEA had learned that one Carlos Ruben Cruz-DeJesus imported heroin from Colombia with a partner, and was believed to be Ofarrill's supplier. ¶¶14-16.

The first confidential source("CS-1") had worked as a DEA informant since December, 2003 and for other law enforcement for three years before that. CS-1 provided information until July, 2004, when DEA stopped using him because he falsely identified a photograph as showing Ofarrill. ¶¶18, 22. CS-1 had known "Sonny" (later determined to be Ofarrill) since early 2004, and knew he operated a heroin distribution ring. CS-1 described the hours of operation and provided names of persons who delivered for Ofarrill.[2] ¶19. CS-1 advised DEA that after one Vicente Ruiz was arrested with 80 grams of heroin, a gun and cash in a hidden compartment of his car, Ofarrill changed his cellphone number. CS-1 provided the new number. ¶¶20, 21. CS-1 made one

---

[1] The February 4, 2005 affidavit of S.A. Forde is submitted as Exhibit A hereto.

[2] CS-1 identified Miguel Fontanez, Dixon Perez, Jose Nicholson and Robert Medeiros. ¶22, all but Fontanez charged in the instant indictment.

controlled buy of heroin alone in April, and then 3 controlled buys accompanied by an undercover DEA agent ("Turgeon") in June and July. Each time CS-1 arranged the purchase with Ofarrill and then met with a runner. CS-1 introduced Turgeon as the real buyer, and thereafter Turgeon made calls directly to Ofarrill while CS-1 was no longer used. ¶¶25-27.

From July to September, Turgeon made five controlled buys totalling 100 grams of heroin from Ofarrill, each time contacting him by telephone (recording the calls) and meeting with a deliverer. Twice he brought a second DEA Agent ("Simmons") and introduced Simmons. In August, Ofarrill informed Turgeon of a new telephone number to call to buy drugs. ¶¶28-34.

Simmons began making direct calls to Ofarrill at this new number on September 29, and between then and January 7, 2005, made five controlled buys totalling 42 grams of heroin, each time recording the conversation with Ofarrill. On November 22, 2004, Ofarrill provided Simmons with a new telephone number, the Ofarrill cellphone, to enable him to continue arranging purchases. On December 1, 2004, Simmons made a call to Ofarrill on the Ofarrill cellphone while Ofarrill was being watched by DEA agents. They confirmed by this means that Ofarrill was the person using the Ofarrill cellphone. ¶¶35-45.

Three other confidential sources, CS-3, CS-4 and CS-5, all provided information in mid-2004 that "Sonny" ran a heroin distribution service in New Bedford, and identified Ofarrill's photograph as "Sonny." ¶¶54, 57, 60. CS-3 and CS-4 had purchased directly from Ofarrill as well as from his employees, ¶¶55, 57, and CS-4 had worked as a runner for Ofarrill, learning that Ofarrill sold 50-100 grams of heroin a day. ¶58. CS-6 provided information that Dixon Perez, identified by other sources as a runner for Ofarrill, lived at 87 Belleville Road, New Bedford but regularly parked his car blocks away from that location, and regularly met with people in various vehicles along

9

Belleville Road, confirming the inference that Belleville Road was a stash house for Ofarrill. ¶63. CS-7 identified Robert Medeiros as a seller for Ofarrill. ¶64.

CS-2 provided information about two importers of heroin, Carlos Ruben Cruz-DeJesus and Gustavo DeJesus Mejia-Lopera, who were connected to Ofarrill through pen registers showing thirty calls between Cruz-DeJesus' number and the Ofarrill cellphone between December 10, 2004 and January 21, 2005. ¶66. CS-2 related that Cruz-DeJesus recruited CS-2 to smuggle 1 1/2 kilograms of heroin into the country from Colombia in June, 2004 and to make a second trip from Venezuela in July, 2004. Neither importation took place. ¶48. In December, 2004, CS-2 was supposed to meet a female courier with 2 kilograms of heroin in Florida and drive the heroin to Massachusetts. The woman was stopped in Miami by customs agents but had no contraband. ¶¶49-51. CS-2 made a controlled buy of heroin from Cruz-DeJesus on January 14, 2005, which was delivered in a form consistent with being ingested by drug couriers to smuggle into the country. ¶52.

A pen register analysis, in addition to showing calls between the Ofarrill cellphone and Cruz-DeJesus, showed hundreds of calls in the same period between that cellphone and cellphones used by Nicholson, Medeiros and Fontanez, employees of Ofarrill. ¶¶66-69.

B.    *The Necessity Showing*

S.A. Forde's February 4, 2005 affidavit recounts the following failings of the investigation to that date, and difficulties with normal investigative procedures. Although agents had established the ability to make controlled buys, they had not been able to meet or deal with Ofarrill in person. ¶72. Although CS-2 was in contact with a Cruz-DeJesus, a supplier of heroin, his success was limited, and the government had not been able to gather sufficient evidence of Ofarrill's heroin

supplier. ¶73.

The use of confidential sources was of limited value because most of them were street-level purchasers, unable to learn Ofarrill's sources of supply or how he laundered his money. Only CS-1, who was untrustworthy, was willing to testify. ¶75. CS-2 had, to date, been unable to "completely" infiltrate the Cruz-DeJesus importation organization. ¶76. Undercover agents had not to date been able to deal directly with Ofarrill, and were thus not in a position to learn of his suppliers or how his money was laundered. CS-2's limited infiltration of the Cruz-DeJesus group did not promise success in introducing undercover agents into that organization. ¶77, 78.

S.A. Forde enumerated three failed attempts to gain information from interviews of Ofarrill's associates and Ofarrill's efforts in one case to insure that Vincent Ruiz did not cooperate with authorities. Further, Forde opined that further interviews would alert Ofarrill to the existence of an investigation and that anyone with detailed knowledge of Ofarrill's operations would fear to disclose that knowledge. ¶¶79-82.

Grand Jury subpoenas are rejected as premature and likely to result in suspects fleeing, asserting privilege and becoming alerted to the investigation. Financial institution subpoenas would not avail because nothing was then known of Ofarrill's financial transactions. ¶83.

Surveillance had established the location of stash houses and identified members of Ofarrill's organization, but was thought unlikely to provide information regarding Ofarrill's suppliers or financial transactions. S.A. Forde noted that they had never seen Ofarrill with Cruz-DeJesus or his colleague, and further stated his experience that significant drug traffickers avoid meeting with their suppliers. S.A. Forde further noted that Ofarrill was vigilant against surveillance and had confronted one surveillance agent he noticed. ¶¶84-86.

S.A. Forde noted the limited utility of non-interception telephone records, including pen registers, in providing information regarding the drug operation, including the difficulty of knowing who is actually using the telephone, since the registered owner frequently is not the user. He noted that search warrants would be unlikely to yield information until the conclusion of the investigation, and with respect to the relationship with suppliers would be unlikely to do anything except cause the supplier to shift or curtail their drug activies. Finally, he disparaged trash searches because the stash houses were located in multi-unit buildings in which trash from other apartments would be commingled. ¶¶87-90.

The foregoing averrals reflect convenience, rather than necessity. What is remarkable about this affidavit is the degree of success that it shows investigators, using conventional methods, had had and could anticipate having, in establishing the scope and contours of the Ofarrill organization under investigation. CS-1 introduced Turgeon to Ofarrill's organization in June, 2004, and within a month of that introduction, Ofarrill was dealing directly with Ofarrill to make controlled buys. What is more, Turgeon himself was able to introduce a second DEA undercover agent to Ofarrill, and again Simmons was able to deal directly with Ofarrill shortly thereafter. Although Ofarrill did not meet in person with either Turgeon or Simmons during the period covered by Forde's affidavit, both of them spoke with him personally in arranging to buy heroin, he gave both of them a new telephone number when he changed numbers, and in the case of Simmons, Ofarrill actually replaced some heroin that he had received from a supplier other than his regular supplier. ¶39[3]  Nothing in Forde's affidavit explains why it was not open to either Turgeon or Simmons to increase the level of purchases from street-level quantities to larger quantities, thus opening up the chance to deal with

---

[3]This provided information that Ofarrill had a "regular" supplier on which he relied.

12

Ofarrill on a more intimate level.

Further, the affidavit discloses that the government was able to avail itself of six different confidential sources in the course of six months. One of those sources, CS-4, actually worked for Ofarrill and was able to see the scope of Ofarrill's sales. ¶58. Again there is nothing in the affidavit addressing why one or the other of the undercover agents could not have attempted this route into Ofarrill's organization, which was available to CS-4, another street-level buyer.

While the Forde affidavit characterized CS-2's utility as having only a "limited degree of success," it recounts that CS-2 actually declined to help Cruz-DeJesus in the first instance, was unable to obtain a visa in the second, and in the third had incorrect information about drugs being imported. Even after this, CS-2 was able to purchase heroin from Cruz-Mejia. There is nothing suggesting that CS-2 had fallen out of favor, or was unlikely to be offered another opportunity to engage in importation of a multi-kilogram quantity of heroin enabling him to learn more about the organization.

In short, major conventional investigative techniques had met with significant success, and avenues lay open for CS-2 on the supplier side, and to undercover agents Turgeon and Simmons on the Ofarrill organization side, to infiltrate and learn precisely what the government sought to learn through wire interception. The signal success the government had had to the date of the affidavit undercuts its assertion that conventional techniques were unlikely to succeed. To be sure, a wiretap promised faster results, but that is not the test Congress set out for allowing such a serious invasion of privacy.

Unless the limitations imposed by Congress on wire interceptions are not meant to be taken seriously, and law enforcement requests to intercept are to be routinely granted in any case alleging

a drug conspiracy, not as a last resort but as a first, this affidavit fails to establish that normal investigative methods into Ofarrill's activities had failed and were unlikely to succeed with further effort on the government's part. The government had two undercover agents in position to increase their involvement in Ofarrill's organization, one confidential source who had not exhausted his chances to infiltrate a major importer's organization and establish a connection between that organization's and Ofarrill's.

Although the Forde affidavit discounts surveillance and points out Ofarrill's sensitivity to it (something common to all criminal enterprises), surveillance was apparently successful in ascertaining the location of stash houses and in confirming Ofarrill's identity. Coupled with the remarkable success in two undercover agents gaining the ability to speak directly to Ofarrill, with a level of trust that caused him to inform them when his phone number changed, this conventional technique was *not* shown to be unlikely to succeed in exposing the scope and structure of the Ofarrill organization. Without further efforts to exploit the, to date highly successful conventional methods of investigation, the affidavit fails to show necessity. If this affidavit is sufficient to authorize a Title III interception, then wire interception is no longer the method of last resort, as required by Title III, but a method of convenience, a short-cut allowing the government to dispense with conventional methods of investigation.

Because the February 4, 2005 Forde affidavit failed to demonstrate the normal investigative techniques being utilized were failing or were unlikely to succeed, the application should have been rejected.

IV.  *Subsequent Warrant Applications, and the Stop of Ortiz-Perez on March 21, 2005, Were the Fruit of the first Ofarrill Cellphone Interceptions and must Be Suppressed*

From the point at which wire interceptions were commenced on February 4, 2005, other

investigative techniques became subsidiary to, and were informed by, the interceptions. Ortiz-Perez was connected to Ofarrill through interceptions on Ofarrill's cellphone pursuant to the second order to intercept Ofarrill's cellphone.

Intercepted conversations on March 21, 2005, led to surveillance in Rhode Island of Ofarrill and of a meeting between Ofarrill and Ortiz-Perez, after which Ortiz-Perez headed north on interstate 95 into Massachusetts where, at S.A. Forde's direction, the car in which Ortiz-Perez was a passenger was stopped and searched, leading to the discovery of heroin.[4] The stop and search was thus the fruit of the second Ofarrill cellphone intercept order.

In turn, the second Ofarrill intercept order, as well as the Morales cellphone intercept order, were the fruits of the first Ofarrill cellphone intercept order. The March 4, 2005 affidavit of S.A. Forde, expressly relied on, and incorporated, the February 4, 2005 Forde Affidavit (¶10 *et seq.*, March 4, 2005 Affidavit) and extensively relied on information obtained from intercepted calls to and from the Ofarrill cellphone to justify extension of the order. Similarly the March 21, 2005 affidavit of S.A. Simmons relied on both of S.A. Forde's affidavits and information collected from the intercepted calls to and from the Ofarrill cellphone to justify issuance of an order allowing interception of calls to and from the Morales cellphone (¶12 *et seq.*, March 21, 2005 Affidavit was Accordingly, all communications intercepted pursuant to the orders of March 4, 2005 and March 21, 2005, authorizing extension of interceptions of the Ofarrill cellphone and interceptions of the Morales cellphone, must be suppressed. *United States v. Giordano,* 416 U.S. 505, 531-33 (1974); *United States v. Carneiro,* 861 F.2d 1171, 1183 (9th Cir. 1988).

---

[4] A copy of the DEA-6 memorializing the surveillance and arrest of Ortiz-Perez is attached hereto as Exhibit B. It is missing a page, as it was in the discovery CD provided by the government, but establishes that surveillance was initiated on the basis of intercepted calls and that the stop of Ortiz-Perez was initiated on the basis of the surveillance.

V.   *Conclusion*

Based on the foregoing, suppression of all interceptions from February 4, 2005 on from cellphones 508-863-3411 and 774-253-6830, and all evidence derived therefrom, including the March 21, 2005 automobile stop and search, should be granted.

                                        Respectfully submitted,

                                        /s/ David Duncan
                                        David Duncan (#546121)
                                        Zalkind, Rodriguez, Lunt & Duncan, LLP
                                        65a Atlantic Avenue
                                        Boston, MA 02110
                                        (617) 742-6020

March 13, 2006

**Certificate of Service**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on the above date.

                                        /s/ David Duncan

| | |
|---|---|
| 1. Program Code | 2. Cross File ☒ Related Files | 3. File N... | 4. G-DEP Identifier |
| 5. By: S/A Michael Burke<br>At: New Bedford R/O<br>New England Field Division | | 6. File Title<br>OFARRILL, Wlifredo et.al |
| 7. ☐ Closed ☐ Requested Action Completed<br>☐ Action Requested By: | | 8. Date Prepared<br>03/22/05 |

9. Other Officers: S/A Dan Forde, TFA's Simmons, Kramer, MSP Trooper Charles Kane & Trp Dan Pina

10. Report Re: Arrest of Jose ORTIZ-PEREZ & Glenis NUNEZ, Acq of Exhibit 28 (INFO ONLY) on 03/21/05. Acquisition of Exhibits N-108 & N-109 on 03/28/05.

**SYNOPSIS**

DEA 6 detailing the arrest of JOSE ORTIZ-PEREZ and Glenis P. NUNEZ and acquisition of Exhibit 28 and Exhibits N-108 & N-109.

**DETAILS**

1. Pursuant to call numbers 4843,4868,4871,4875,4876 & 4878 over a court authorized title III intercept on target telephone number one (508)863-3411, surveillance was established at two 7-11 convenience stores in Providence, RI.

2. At approximately 3:10pm, S/A Dan Forde observed a white Toyota Previa van bearing MA registration 18KJ31 parked at the 7/11 store on Charles St Providence. This vehicle is registered to Glenis NUNEZ and she, along with Carlos D. RUBEN-CRUZ, were observed in the van. Carlos D. RUBEN-CRUZ was indexed in another NBRO case file and was suspected of being a high level heroin trafficker with ties to a Colombian based heroin distribution organization.

3. RUBEN-CRUZ and NUNEZ eventually met with the user of target telephone number one, Jose FIGUEROA, and the three traveled to 16 Lisbon St, Providence, RI. The three stayed at the residence until approximately 4:18pm and were observed by TFA Kramer exiting the

| 11. Distribution:<br>Division<br>District<br>Other   SARI | 12. Signature (Agent)<br>S/A Michael Burke  *[signature]* | 13. Date<br>4/8/05 |
| | 14. Approved (Name and Title)<br>Michael Barbuti<br>Resident Agent in Charge  *[signature]* | 15. Date<br>4/11/05 |

DEA Form - 6
(Jul. 1996)

DEA SENSITIVE
Drug Enforcement Administration

mwb Arrest 3/21/05 2.7 kilos heroin.
3 - Originating Office

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

USAO001070
USAO001070

| REPORT OF INVESTIGATION (Continuation) | 3. | | |
|---|---|---|---|
| | OFARRILL, Wlifredo et.al | | |
| 4. Page 3 of 4 | | | |
| 5. Program Code | | 6. Date Prepared 03/22/05 | |

phones and to determine where NUNEZ and ORTIZ-PEREZ may live. Incoming calls from ORTIZ-PEREZ' wife, Maria ZAPATA, to target phone number one after the arrest, indicated that ORTIZ-PEREZ had more heroin stashed at an unknown location. Prior surveillance of ORTIZ-PEREZ indicated that this location may be at 50 Walford Way, Charlestown, MA or 195 Quincy St., Dorchester, MA.

9. S/A Burke retrieved all phone numbers from the three phones and determined that ORTIZ-PREREZ was using 50 Walford Way #653 as his primary residence. Agents were unable to retrieve the suspected heroin, however intercepted calls from Maria ZAPATA to target telephone number one and target telephone number two indicated that three hundred grams of heroin was retrieved by ZAPATA, given to unknown Hispanic male, who in turn was to deliver it to a runner known as Jose NICHOLSON. NICHOLSON was arrested prior to meeting with the unknown male.

**CUSTODY OF EVIDENCE**

1. On 03/21/2005, Massachusetts State Trooper Charles Kane, at the direction of DEA, performed a vehicle stop on a white Toyota Previa bearing MA registration 18KJ31, operated by Glenis NUNEZ and also occupied by Jose ORTIZ-PEREZ aka JOHNNY aka Miguel G. SANTANA. Trooper Kane obtained verbal consent to search from NUNEZ and subsequently identified and located a hidden compartment in vehicle containing appr. 2.7 kilograms of heroin and at least 1000 grams of cutting agent. Tpr Kane laced NUNEZ and ORTIZ-PEREZ under arrest and subsequently took control of Exhibit 28, submitting same in the temporary drug locker pending analysis at MA state lab.

**CUSTODY OF NON-DRUG EVIDENCE**

1. Exhibit N-108 was seized by S/A Burke from the property custodian at the Bristol County Sheriffs Dept on 03/28/05. Exhibit N-108 is described as two T-Mobile cellular phones, one Motorola and one Samsung belonging to Jose ORTIZ-PEREZ, a/k/a Johnny, a/k/a Carlos D. RUBEN-CRUZ. S/A Burke retrieved the outgoing and incoming numbers

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

3 - Originating Office

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

USAO001071
USAO001071

| REPORT OF INVESTIGATION (Continuation) | | |
|---|---|---|
| | 3. File No. | |
| | OFARRILL, Wlifredo et.al | |
| 4. Page 4 of 4 | | |
| 5. Program Code | 6. Date Prepared 03/22/05 | |

from each phone and packaged them as evidence, as witnessed by TFA Simmons, and placed it in the NBRO Non-Drug Vault for safekeeping.

2. Exhibit N-109 was seized by S/A Burke from the property custodian at the Bristol County Sheriffs Dept on 03/28/05. Exhibit N-109 is described as one Motorola cellular phone color blue, belonging to Glenis P. NUNEZ. S/A Burke retrieved the outgoing and incoming numbers from each phone and packaged them as evidence, as witnessed by TFA Simmons, and placed it in the NBRO Non-Drug Vault for safekeeping.

**INDEXING**

1. NUNEZ, Glenis P.
2. ORTIZ-PEREZ, Jose A.

DEA Form - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

3 - Originating Office

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

USAO001072
USAO001072