IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA        )
                                )          CRIMINAL ACTION
        v.                      )
                                )          05-10115-JLT
                                )
14. JOSE ORTIZ-PEREZ            )
      a/k/a "Jhonny"            )
                                )

**UNITED STATES' OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS WIRETAP EVIDENCE**

The United States respectfully submits that defendant's motion to suppress wiretap evidence should be denied. Defendant's argument that the wiretap applications failed to satisfy the necessity requirement has no merit. The wiretap affidavits described in case specific detail numerous undercover purchases from the organization that failed to reach the leader of the organization or its' sources of supply for heroin.

**I. FACTUAL SUMMARY**

**A.    Background of the Investigation**

The investigation that led to the indictment in this case began in early 2004. The case was investigated by the DEA in New Bedford, which included detectives from the New Bedford Police Department (NBPD) and other local law enforcement officers who were assigned to the DEA as Task Force Agents (TFA). The investigation focused on a local heroin dealer from the Dominican Republic known as "Sonny," who also used the names Wilfredo Offarill and Jose Luis Figueroa-Ramos. Another target of the investigation was a heroin

1

supplier from the Dominican Republic known as "Jhonny" who at the time was identified as Carlos Ruben Cruz-DeJesus (who was later identified and charged in the indictment as Jose Ortiz-Perez). According to information from a confidential informant, "Jhonny" and his partner Gustavo Mejia, were arranging to import kilogram quantities of heroin from Colombia.  Based on telephone toll records, there were multiple calls between "Jhonny" and "Sonny" indicating some type of drug relationship.

Between June 2004 and February 2005, DEA made approximately fourteen undercover purchases of heroin from "Sonny." During these undercover purchases, the undercover officer called "Sonny" on his cell phone to arrange for the purchase of heroin.  On each occasion, after the phone calls were made, instead of delivering the heroin himself, "Sonny" sent one of his "runners" (including DIXON PEREZ, JOSÉ NICHOLSON, and ROBERT MEDEIROS) to deliver the heroin to the undercover agent.  The undercover agent was never able to meet and negotiate with "Sonny" face-to-face.

## B.    Title III Wiretaps

There were three orders for the interception of wire communications in this case.  On February 4, 2005, the Honorable William G. Young, then-Chief U.S. District Court Judge for the District of Massachusetts, signed an order authorizing the interception of wire communications over telephone number (508) 863-3411 (the "OFARRILL Target Telephone"), a T-Mobile cellular telephone subscribed to Jose Figueroa and used by JOSE LUIS FIGUEROA-RAMOS, a.k.a. Wilfredo Ofarrill, a.k.a. "Sonny." On March

4, 2005, U.S. District Judge Young signed an order extending the authorization over OFARILL Target Telephone.

The interception of telephone calls over the OFARRILL Target Telephone revealed evidence of an ongoing heroin conspiracy where FIGUEROA, a.k.a. "Sonny," directed a group of runners, including JOSE NICHOLSON, DIXON PEREZ, MIGUEL CASADO, and ROBERT MEDIEROS to deliver wholesale quantities of heroin to a regular group of heroin customers in New Bedford, including HERMAN MELO, BRIAN KEENAN, WILFREDO TORRES and DAVID ROSININA. Based on intercepted phone calls, FIGUEROA also appeared to have several sources of supply of heroin, including "Jhonny" (JOSE ORTIZ-PEREZ, a.k.a. Carlos Ruben Cruz-DeJesus), LUIS D. SOUCLAT, a.k.a. "Junito," and JOSE MORALES, a.k.a. "Melvin."

In March 2005, the government applied for a Title III wiretap on the primary suspected heroin supplier, JOSE MORALES, a.k.a. "Melvin." In particular, on March 21, 2005, the Honorable Patti B. Saris, U.S. District Court Judge for the District of Massachusetts (acting in lieu of the Honorable William G. Young), signed an order authorizing the interception of wire communications over cellular telephone number (774) 253-6830, a T-Mobile Pre-Pay cellular telephone subscribed to Juan Rivera and used by JOSE MORALES, a.k.a. "Melvin" (the "MORALES Target Telephone").[1]

The interception of wire communications over these two

---

[1] As further described below, because defendant was not an "aggrieved party" under 18 U.S.C. Sec. 2510(11) for the MORALES wiretap, defendant lacks standing to contest these wire interceptions.

cellular phones (the OFFARILL Target Telephone and the MORALES Target Telephone) continued until March 31, 2005 when the DEA arrested the defendants in this case pursuant to a criminal complaint. In addition, the DEA executed five search warrants in New Bedford and five search warrants in Providence. The probable cause for the complaint and the search warrants was based in part on summaries of phone calls intercepted pursuant to the above described Title III wiretaps. During the course of these search warrants, agent seized more than two kilograms of heroin, cocaine, crack cocaine, large amounts of cash, heroin processing materials, and drug ledgers.

## C.    The February 4, 2005 Affidavit Wiretap Affidavit for (508) 863-3411 (the "OFARRILL Target Telephone")

The February 4, 2005 wiretap affidavit submitted in support of the interception of wire communications over the OFARRILL Target Telephone identified Wilfredo Offarill, a.k.a. "Sonny" and Carlos Ruben Cruz-DeJesus, a.k.a. "Jhonny" as two of the primary targets of the heroin investigation. (Pgs 9-10, ¶¶12-13). According to confidential informants, "Sonny" operated a multi-gram heroin delivery service in New Bedford, MA that functioned much like a legitimate business, selling heroin from 10:00 a.m. to 6:00 p.m. Monday through Saturday and on Sunday from 10:00 a.m. to 4:00 p.m. These confidential informants stated that "Sonny" employed several "runners" to make the actual deliveries in order to minimize his risk and exposure to law enforcement. Some of the runners these confidential informants identified included defendants DIXON PEREZ,

4

ROBERT MEDEIROS, and JOSE NICHOLSON.

**1.    Controlled Purchases of Heroin from "Sonny" and Dixon Perez Utilizing CS-1**

One of these confidential informants (identified as CS-1 in the affidavit) had acquired "Sonny's" telephone number. (Pgs 13-14 ¶22).  CS-1, a registered DEA confidential source, told law enforcement agents that "Sonny" received orders for heroin sales over this telephone but then directed his runners to deliver the heroin to the customer at a pre-determined meeting location. "Sonny" never made the delivery himself.  (Pgs 13-14 ¶22).

Beginning in April 2004, under the control and direction of DEA, CS-1 began making controlled purchases of heroin from "Sonny." On each occasion, CS-1 placed a phone call to "Sonny" to arrange the purchase of heroin.  After the phone calls were made, instead of delivering the heroin himself, "Sonny" sent one of his "runners" to complete the transaction. (Pg 13-14, ¶22).

**2.    CS-1's Mis-Identification of Sonny**

On April 16, 2004, CS-1 called "Sonny" and arranged to purchase 5 grams of heroin.  "Sonny" sent an Hispanic male identified as Miguel Fontanez who delivered 4.2 grams of heroin to CS-1 in exchange for $560. (Pg 14, ¶23).  Following this transaction, agents showed CS-1 photographs of Miguel Fontanez and Wilfredo Ofarrill.  CS-1 erroneously identified the photograph of Fontanez, not Offarill, as "Sonny."  Further investigation revealed that CS-1 was not truthful about this identification.  After this, DEA discontinued using CS-1 in the investigation, due to concerns over CS-1's credibility and reliability, and decided to attempt to

introduce an undercover agent to negotiate purchases of heroin from "Sonny." (Pg 14-15, ¶ 24).

### 3.    Undercover Purchases of Heroin from "Sonny," and "Sonny's" Runners, Dixon Perez, Jose Nicholson and Robert Medeiros

Starting in June 2004, DEA was able to introduce an undercover agent to "Sonny," over the telephone.  The undercover agents negotiated the purchase of small quantities of heroin from "Sonny" over the phone but were never able to meet with "Sonny" face-to-face.  Instead, "Sonny" always sent his runners to deliver the heroin and complete the transaction.

Between June 18, 2004 and September 30, 2004,  DEA made nine undercover ("UC") buys of heroin from "Sonny." (Pgs 15-21 ¶25-36). The heroin for each of these transactions were delivered not by "Sonny," but by "Nelson" (DIXON PEREZ) one of "Sonny's" runners. On September 1, 2004, the first UC agent ("Mike") introduced a second UC agent ("Andy"). (Pg 19 ¶33).  On July 21, 2004, New Bedford Police conducted a traffic stop of "Nelson" and identified him as DIXON PEREZ through his driver's license. (Pg 15, fn 4). During these nine UC buys, DEA and other agents conducted surveillance to attempt to identify "Sonny" and his stash location for the heroin he was selling.  During these nine UC buys, agents never saw "Sonny."

On August 4, 2004, DEA and other law enforcement agents attempted to conduct surveillance on "Sonny" in the area of 16-18 Lisbon Street in Providence, RI.  After a surveillance agent observed a vehicle driving frequently around the block, the surveillance agent changed her location, at which time, "Sonny"

walked up to her vehicle and asked if she was lost, and where she was from.  At this time, surveillance was terminated, since it was apparent that "Sonny" had spotted police surveillance.  Five days later, on August 9, 2004, "Sonny" discontinued the phone number he was using and began using another cell phone number. (Pg 43, ¶86). The new number was subscribed to Jose F. Colon, 99 Capital Street, Apt. 3, Pawtucket, RI. (Pg 18, ¶31).

Days later, on August 8, 2004, PEREZ was arrested while in the possession of a small quantity of heroin. (Pg 8, ¶9(f)). Following his arrest, PEREZ did not cooperate with the police. Thereafter, beginning in October 2004, "Sonny" sent different runners to deliver the heroin to the UC Agent.  On October 25, 2005 and November 23, 2005, "Sonny" told the UC agent to get the heroin from a short Hispanic male who was later identified as JOSE NICHOLSON. (Pg 21, ¶36; Pg 22, ¶38).  Before the November 23, 2005 transaction, "Sonny" gave the UC agent his (Sonny's) new telephone number, 508-863-3411; the telephone which was later the subject of a Title III wiretap beginning on February 4, 2005. (Pg 22, ¶38).

On December 1, 2004, DEA conducted surveillance of the Hispanic male they believed to be "Sonny" to confirm he was the same individual with whom the UC agents had been dealing with on the telephone.  DEA SA Mike Burke followed "Sonny" into a convenience store in Providence.  At the same time, TFA Andrew Simmons, one of the UC Agents, made a recorded phone call to "Sonny" at this new telephone number, 508-863-3411.  SA Burke saw and overheard "Sonny" answer the phone.  Later, SA Burke listed to the recorded phone call that TFA Simmons and confirmed it was the same

7

Hispanic male who answered the phone in the store. (Pg 23, ¶40). SA Burke also identified a driver's license photograph of Wilfredo Offarrill as the man in the store. At the time, "Sonny" had two MA operator's licenses, one under the name Wilfredo Ofarrill and another under the name Jose Luis Figueroa-Ramos. "Sonny" also had a RI operator's license under Jose L. Figueroa. (Pg 23, ¶40, fn 9).

On December 9, 2004 and January 7, 2005, "Sonny" sent a white male to deliver the heroin to the UC who was identified as ROBERT MEDEIROS. (Pg 24, ¶42; Pg 26, ¶45). Months before, on May 15, 2004, NBPD Detectives arrested MEDEIROS after conducting surveillance, and observing what they believed to be a drug transaction. Detectives seized approximately 45 grams of heroin from the red Grand Cherokee that MEDEIROS was driving. MEDEIROS waived his Miranda rights and agreed to speak with the Detectives. MEDEIROS admitted that he was working for "Sonny" making heroin deliveries. MEDEIROS also admitted that the red Grand Cherokee belonged to him. Nonetheless, MEDEIROS was released on bail and, as described above, continued to engage in heroin transactions for "Sonny." (Pg 40, ¶80).

**4. Suspected Source of Supply: "Jhonny" (JOSE ORTIZ-PEREZ, a.k.a. Carlos Ruben Cruz-DeJesus)**

Another target of the investigation was a heroin supplier who at the time was identified as Carlos Ruben Cruz-DeJesus, a.k.a. "Jhonny" (who was later identified as Jose Ortiz Perez). (Pg 10, ¶14). According to another DEA confidential informant (referred to

8

as CS-2 in the affidavit), "Jhonny" financed multi-kilograms shipments of heroin from Colombia with his partner Gustavo Mejia. (Pg 27, ¶47). Most of the information about "Jhonny" came from a confidential informant ("CS-2"). (Pg 27, ¶46). CS-2 knew "Jhonny" and his partner Gustavo Mejia since May/June 2004, but did not know "Sonny" and was not aware of any possible connection between "Jhonny" and "Sonny." (Pg 27, ¶47).

"Jhonny" came to the attention of DEA after a seizure of 10 kilograms of heroin in Texas. (Pg 10-11, ¶15). On January 22, 2004, the DEA in Fort Worth arrested a Orlando Vega in the possession of 10 kilograms of heroin. On Vega's person, agents found a handwritten piece of paper with a then current phone number for "Jhonny," (508) 904-4101, which was subscribed to Carlos DeJesus at 87 Belleville Road in New Bedford, (Pg 11, ¶16), the address of an apartment used both by "Sonny" (Pg 6, ¶9(a)) and DIXON PEREZ (Pg 8, ¶ 9(f)). According to telephone toll records, "Jhonny" was having frequent telephone contact with "Sonny." Based on this connection, agents believed that "Jhonny" was a supplier of heroin to "Sonny." (Pg 11, ¶16).

On October 5, 2004, DEA SA Daniel Forde (the affiant of the February 4th affidavit) and DEA TFA Michael Turgeon interviewed Vega about his knowledge of "Sonny," "Jhonny" and the (508) 904-4101 phone number found on his possession in Texas. (Pg 41, ¶81). Agents Forde and Turgeon showed Vega photographs of "Sonny" and "Jhonny," but Vega failed to identify them. Vega furthermore stated that the (508) 904-4101 belonged to a man Vega only knew as "Frello" who worked at a factory in Providence, but did not sell

9

heroin.  Based on Vega's apparent nervousness, agents believed that Vega was not being truthful. (Pg 41, ¶81).

### a.    Attempted Controlled Delivery of Heroin

In June 2004, Gustavo Mejia offered CS-2 $10,000 to travel to Medellin, Colombia and bring back two suitcases each containing one-and-a-half kilograms of heroin.  Under the direction of DEA, CS-2 traveled to Medellin, but CS-2 refused to make the return trip to Massachusetts with the heroin.  CS-2 remained in Colombia for several weeks then returned to Massachusetts. (Pg 27, ¶48).

### b.    Second Attempted Controlled Delivery of Heroin

In July 2004, Mejia gave CS-2 another opportunity to make money smuggling heroin into the U.S.  Mejia offered to pay CS-2 to transport heroin from Caracas, Venezuela to Miami.  Mejia told CS-2 that "Johnny" would give CS-2 money for the plane ticket to Venezuela. (Pg. 28, ¶48).  On September 10, 2004, "Jhonny" purchased a plane ticket in cash for CS-2 to travel to Venezuela at Fernandez Travel Agency in Brockton, MA.  During the purchase of the plane ticket, DEA and other law enforcement agents conducted surveillance outside of Fernandez Travel Agency and observed CS-2, Mejia, and "Jhonny" enter and leave the travel agency together. (Pg. 28, ¶48, fn 14).  After the heroin was smuggled into Miami, Mejia told CS-2 to drive the heroin to MA in a rental car, and give it to "Alex," another one of Mejia's associates who was identified as Eduardo Garcia.

The trip never took place because, because CS-2 could not obtain a visa to Venezuela in enough time. (Pg. 28, ¶48). Nevertheless, in December 2004, according to CS-2, Mejia arranged

10

for a female courier identified as Elizabeth Espinoza to travel to Colombia to bring back heroin hidden in a suitcase. (Pg. 28, ¶49). Under the direction of DEA, on December 5, 2004, Mejia and CS-2 drove Espinoza to Logan Airport for her flight to Medellin, Colombia.  Days later, on December 9, 2004, CS-2 made a recorded phone call to Mejia about the progress of the heroin smuggling venture.    During this call, Mejia stated that one-and-a-half kilograms of this heroin would be going to "Jhonny."

In early December 2004, Mejia and CS-2 drove together from MA to Miami in a car in which DEA had installed a GPS tracking device to follow the vehicle and a listening device to enable agents to monitor and record conversations between CS-2 and Mejia in the vehicle.  Once in Miami, Mejia told CS-2 that Espinoza's arrival was delayed because the heroin was not ready.  (Pg. 29, ¶50).

Despite these efforts, when Espinoza was stopped and searched at Miami International Airport on December 18, 2004, law enforcement agents found nothing. (Pg. 29, ¶51).  Inspectors from the Bureau of Immigration and Customs Enforcement ("ICE") stopped and detained Espinoza.  ICE inspectors were unable to find any contraband on Espinoza's person or in her luggage and she was thereafter released.

        **c.    Controlled Purchase of 10 Grams of Heroin from "Jhonny"**

On January 14, 2005, under the direction of law enforcement, CS-2 made a controlled purchase of 10 grams ("one finger") of heroin from "Jhonny" in Boston, MA. (Pg 29, ¶52).  Before the transaction, CS-2 made a recorded phone call to cellular telephone,

(857) 389-0056, a number that "Jhonny" as his phone number. According to toll records, between December 10, 2004 and January 16, 2005, this number has been in contact with the "Sonny's" telephone number, the OFARRILL TARGET TELEPHONE, thirty-two times. (Pg 30, ¶52, fn17; Pg 35, ¶66).

    **5.    The Stated Goals of the Investigation**

    In addition to describing specific facts about the progress of the investigation, the affidavit also specified the type of communications the wiretap was expected to produce, including:

    (i) the identities, roles, and whereabouts of members of the organization, other than the identified Target Subjects, including sources of supply, other distributors, and customers;

    (ii) the nature and extent of the participation of the Target Subjects, the sources, the distributors, and the customers of the heroin trafficking and money laundering conspiracies;

    (iii) the dates, times, and places of commission of heroin trafficking and money laundering offenses;

    (iv) the location, receipt, administration, control, management, and disposition of heroin, records evidencing heroin trafficking activities and the proceeds of heroin trafficking and other illegal activities;

    (v) other locations utilized in the furtherance of these illegal activities;

    (vi) the location and disposition of the proceeds from those activities; and

    (vii) the nature, scope, places, and methods of operation of

12

the heroin trafficking and money laundering operation.

**D.    The March 4, 2005 Wiretap Affidavit for a Thirty-Day Extension of Wire Interceptions Over the OFARRILL Target Telephone**

On March 4, 2005, the government filed an affidavit in support of an application to extend the Judge Young's February 4, 2005 order authorizing the interception of wire communications over telephone number (508) 863-3411, the OFARILL Target Telephone used by "Sonny."  The twenty-nine page affidavit described the progress of the investigation, summarized a some of the more relevant intercepted calls, and identified seven additional interceptees who had not been earlier identified before the interception of wire communications.

One of these new interceptees was an individual who was believed to be "Sonny's" primary source of supply of heroin who was referred to as "Melvin."  (Pg. 9, ¶12).  The affidavit also indicated that while there were some intercepted phone calls between "Sonny" and "Jhonny," another suspected source of supply, the precise nature of these conversations was unclear.  (Pg. 9, ¶12).

**E.    Seizure of 2.2 Kilograms of Heroin and One Kilogram of Heroin Cut ("Cortina") from "Jhonny" (JOSE ORTIZ-PEREZ) on March 21, 2005**

During an series of intercepted calls on March 21, 2005, "Sonny" and "Jhonny" arranged for "Jhonny" to pick up "stuff" "Sonny" (FIGUEROA).  During an intercepted call at 11:04 a.m., FIGUEROA asked "Jhonny" if he was going to pick-up "the stuff." "Jhonny" said that he would be around later after he ran some errands.  FIGUEROA said that even if it was *"cortina"* (common

code/slang for heroin cut), he still needed to pick it up.
"Jhonny" asked "Sonny" if "it" looked good.  FIGUEROA said that he
had not seen it because he sent "Jaiva" (JOSE NICHOLSON) to put it
away (into the hidden compartment).  "Jhonny" replied that he would
call FIGUEROA a little later so that they could meet somewhere.

Later the same day, starting at around 2:43 p.m., "Sonny" and
"Jhonny" arranged to meet up at a 7-11 convenience store in
Providence before proceeding onto FIGUEROA's stash location at 16
Lisbon Street.  At around 3:10 p.m., SA Forde observed "Jhonny" and
an Hispanic female later identified as Glenis Nunez arrive at the
7-11 in a white Toyota Previa van which was registered to Nunez.
A short time later, SA Forde observed "Jhonny" and Nunez meet up
with FIGUEROA at the 7-11 store.  DEA then followed "Jhonny,"
Nunez, and FIGUEROA and then drove in tandem to 16 Lisbon Street.
"Jhonny" and Nunez remained inside 16 Lisbon Street until around
4:18 p.m.  "Jhonny" and Nunez then drove to a restaurant in
Providence after which DEA followed the white van onto North
Interstate-95.

SA Forde contacted MSP (K-9) Trooper Charles Kane to inform
him that the DEA had reliable information that the white van he
described contained drugs.  At 5:42 p.m., Trooper Kane pulled over
the white van for a moving violation (merging into the lane of
traffic).  Trooper Kane identified the driver as Glenis P. Nunez
and the sole passenger, "Jhonny," as JOSE ORTIZ-PEREZ through a MA
driver's license.

During the traffic stop, Nunez appeared very nervous and
could not find the registration to the vehicle though she indicated

14

that the car was registered to her.  Trooper Kane asked Nunez the reason for their travel to Providence.  Nunez stated that they (she and Ortiz) had driven to Providence to purchase a Play Station-2 game system, but Nunez could not recall the name of the store to which they went to buy the game.  Trooper Kane asked Nunez if she had anything to hide in her vehicle.  Nunez said she had nothing to hide and gave Trooper Kane consent to search the vehicle.

Trooper Kane looked inside the vehicle and saw that the padding under the carpet had been soaked with motor oil and fuel, which is often done to mask the odor of illegal drugs.  Trooper then observed after factory wires running along the driver's side doorframe towards the backseat.  These wires led to a metal plate with hinges in the floor.  According to Trooper Kane, the metal plate appeared to a door to an after factory hidden compartment used to store illegal drugs.  Thereafter, Trooper Kane had his certified narcotics dog run through the exterior and interior of the vehicle.  The drug dog alerted to area where the suspected hidden compartment was located.  After this, Trooper Kane pried open the door to the compartment and observed a large quantity of light brown powder which Trooper Kane suspected to be heroin.  The substance was later analyzed and determined to contain heroin and weighed approximately 2.2 kilograms.  Inside the compartment, Trooper Kane also found what is believed to be about a kilogram of heroin cut (*cortina*).  Nunez and ORTIZ were arrested and charged in Bristol County with trafficking in a class A controlled substance.

15

## II.  LEGAL ARGUMENT

Defendant now argues that the intercepted phone calls described above should be suppressed because the wiretap applications failed to demonstrate "necessity."  In particular, defendant asserts that normal investigative techniques had been "remarkably successful" in establishing the "scope and contours" of the organization. (Defendant's Motion at 7 and 12).  As support, defendant makes two arguments.

First, defendant points out that DEA was able to introduce to undercover agents to FIGUEROA (Ofarrill) who were able to purchase small quantities of heroin from FIGUEROA over the telephone. Defendant asserts that even though these undercover officers were never able to meet with FIGUEROA and negotiate with him face-to-face, these undercover agents could have further infiltrate the organization.  Second, even though the DEA made three attempts at intercepting a shipment of heroin utilizing CS-2, defendant argues that it was not shown that CS-2 could not have made another attempt of a controlled delivery of heroin.

As further described below, defendant's argument has no merit. First, over a period of ten months, the DEA made multiple undercover purchases of small quantities of heroin from "Sonny." During these buys, "Sonny" insulated himself by sending a group of runners to deliver the heroin for him.  The undercover agents never saw "Sonny" and were never able to negotiate with him face-to-face.

17

The undercover agents were never able to infiltrate the organization and were never able to identify the individuals who were supplying "Sonny" with large quantities of heroin. Instead, the agents were only able to negotiate with "Sonny" over the telephone.

Second, the DEA utilized a cooperating source (CS-2) over a period of six months to investigate one of "Sonny's" suspected source of supply, "Jhonny" (defendant JOSE ORTIZ-PEREZ). Despite these efforts, which included recorded phone calls, and three attempts at an international controlled delivery of heroin, DEA was able to intercept any of the heroin and was never able to establish any type of illicit relationship between "Sonny" and "Jhonny."

As further described below, under the applicable legal standard, the affidavit was at least "minimally adequate" to establish that a wiretap was reasonably necessary to achieve the legitimate goals of the heroin investigation.

**A.  Legal Standard: The "Necessity Requirement" of Title 18, United States Code, Section 2518(1)(c) of Title III**

Title 18, United States Code, Section 2518(1)(c) provides that a wiretap application must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This provision of Title III and its counterpart, 18 U.S.C. §2518(3)(c), requiring a judge to find that normal investigative procedures have

18

been tried and failed, appear unlikely to succeed, or are too dangerous, are often referred to together as the "necessity requirement."  The necessity requirement is intended to ensure that electronic surveillance is not used when normal investigative techniques are adequate to expose the crime.  See United States v. Kahn, 415 U.S. 143, 153 n.12 (1974).

### 1.    "Necessity" Does Not Require A Showing that Traditional Investigative Techinques Were "Wholly Unsuccessful" or "Proof Positive" that a Wiretap Was Necessary

The First Circuit has repeatedly "interpreted that provision [the necessity requirement] to mean that the statement should demonstrate that the government has made 'a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to'" a wiretap.  United States v. Villarman-Oviedo, 325 F.3d 1, 9 (1st Cir. 2003)(quoting United States v. Hoffman, 832 F.2d 1299, 1306-07 (1st Cir. 1987)).  The government's affidavit filed in support of a wiretap must show with specificity why ordinary means of investigation will fail; conclusory statements without factual support are not sufficient.  Id. at 9.

The government, however, need not prove that other investigatory techniques were entirely unsuccessful before resorting to a wiretap.  United States v. Rivera-Rosario, 300 F.3d 1, 19 (1st Cir. 2002) (although government's less intrusive investigatory techniques provided some valuable assistance, a wiretap was still warranted to uncover the conspiracy members, the supplier of the drugs, and the organizational structure of the

conspiracy).  In particular, the First Circuit has emphasized that:

> the government does not need to exhaust all other investigative procedures before resorting to wiretapping.  Nor must ordinary techniques be shown to have been wholly unsuccessful.  Rather, the district court must satisfy itself that the government has used normal techniques but it has encountered difficulties in penetrating a criminal enterprise or in gathering evidence –– to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable.

United States v. Abou-Saada, 785 F.2d 1, 11 (1st Cir. 1986); accord

Villarman-Oviedo, 325 F.3d at 9.  Put another way:

> An application for electronic surveillance need not be based on proof positive that, without electronic assistance, a promising investigation is up a blind alley.  It is enough that reasonable efforts to succeed without such assistance have been tried and failed, and that electronic surveillance seems a suitable next step in a plausible progression.

United States v. David, 940 F.2d 722, 729 (1st Cir. 1991); accord

United States v. Corrado, 227 F.3d 528, 539 (6th Cir. 2000) (holding

that purpose of section 2518(1)(c) "is not to foreclose electronic

surveillance until every other imaginable method of investigation

has been unsuccessfully attempted, but simply to inform the issuing

judge of the difficulties involved in the use of conventional

techniques") (citation and internal quotation marks omitted).

**2.    Flexibility and a Practical Commonsense Approach is Required When the Wiretap Involves the Investigation of a Drug Trafficking Organization**

The First Circuit furthermore has been consistent in its

recognition that, when prosecuting highly organized drug traffickers who are often sophisticated and difficult to track, there is a need to be flexible and view the totality of the circumstances before constricting the tools of an investigation. See United States v. David, 940 F.2d 722, 728 (1st Cir. 1991); United States v. Uribe, 890 F.2d 554, 556-7 (1st Cir. 1989); United States v. Ashley, 876 F.2d 1069, 1073 (1st Cir. 1989); United States v. Hoffman, 832 F.2d 1299, 1308 (1st Cir. 1987). "Because drug trafficking is inherently difficult to detect and presents formidable problems in pinning down the participants and defining their roles, investigative personnel must be accorded some latitude in choosing their approaches." David, 940 at 728.

This recognition of the uniqueness of large-scale drug prosecution has been reflected in several First Circuit cases resulting in the admission of wiretap evidence against drug traffickers. In Hoffman, 832 F.2d at 1306-7, the court rejected appellant's argument that Title III's requirement of pre-interception investigative efforts was not met. Rather, the court stated that "the law was not meant to force the government to run outlandish risks or exhaust every conceivable alternative before seeking a wiretap." Id. The court concluded that the government's efforts in using confidential informants, visual surveillance, pen registers and telephone toll records met the "reasonable, good faith effort to run the gamut of normal investigative procedure

21

before resorting to means so intrusive as electronic." Id.
Additionally, the court noted that the suspects "considerable
craftiness, circumspection, and caution," contributed to the need
for a wiretap. Id. at 1307.

Two years later, the First Circuit relied upon Hoffman in two
separate cases, one of which overturned a trial court's decision to
suppress wiretap evidence, see Ashley, 876 F.2d at 1075, and a
second which upheld a trial court's decision to deny a motion to
suppress wire evidence. See Uribe, 890 F.2d at 558. In Ashley,
the First Circuit rejected the district court's "overly restrictive
interpretation," Ashley, 876 F.2d at 1075, of relevant First
Circuit case law, and instead used the "requisite practical and
commonsense manner," Id., in finding that the affidavit of a Drug
Enforcement Administration agent satisfied the government's burden
to show a "reasonable likelihood" that other investigatory avenues
would not suffice.[2] Id.

In Uribe, the court found that a wiretap was appropriate
because the government had undertaken a variety of pre-interception
efforts and because "by its very nature, drug trafficking is hard
to pin down." Uribe, 890 F.2d at 556.

The First Circuit again addressed these same issues in David,

---

[2] The agent's affidavit stated that other methods such as
physical surveillance, undercover infiltration or grand jury
investigation would likely not succeed because the of the suspect's
extreme wariness of government surveillance. Ashley, 876 F.2d at
1074-5.

where the defendant argued that the district court erred in denying a motion to suppress electronic surveillance evidence. David, 940 F.2d at 727. In addressing the defendant's argument that the Drug Enforcement Administration had not pursued sufficient alternative investigative techniques before resorting to electronic surveillance, the court stated that the "inquiry is not rigid or rule-oriented." Id. at 728. Rather, because of the unique challenges that prosecuting drug trafficking presents, "investigative personnel must be accorded some latitude in choosing their approaches." Id. The defendant/appellant's second argument was that the government had failed to satisfy the statute's necessity requirement. The court rejected the argument, finding that the DEA's efforts in questioning informants, using a beeper clone, undercover agents, and attempting physical surveillance were sufficient to show that a wiretap was appropriate. Id.

In Lopez, the First Circuit stated that the "necessity requirement is not tantamount to an exhaustion requirement." Id. at 52. The court found that, although "conclusory statements without factual support are not sufficient," Id. at 53, the government's affidavit set forth more than the required information to allow an issuing judge to find a wiretap necessary.[3] Id.

_____

[3] The affidavit reported the use of physical surveillance, grand jury subpoenas, undercover drug purchases, pen registers, trap-and-trace devices, and search warrants. Lopez, 300 F.3d at 53, n.2. The government also provided issuing judge with information that about the suspects increasing awareness of government surveillance and the government's difficulty in

3.    **The Reviewing District Court's Standard of Review: The Facts Set Forth in the Affidavit Must Be "Minimally Adequate"**

A district judge who reviews a wiretap application in the first instance must not, the First Circuit has stated, apply a "rigid or rule-oriented" approach to the application's adequacy. David, 940 F.2d at 728.  On the contrary, "'Title III demands a practical, commonsense approach to exploration of investigatory avenues and relative intrusiveness.'" Id. (quoting United States v. Urib, 890 F.2d 554, 556 (1st Cir. 1989)).

Furthermore, a district judge asked to review *another* district judge's decision to approve a wiretap application has an even more limited role: "The reviewing court examines the face of the affidavit and 'decide[s] if the facts set forth in the application were *minimally adequate* to support the determination that was made.'" Villarman-Oviedo, 325 F.3d at 9 (emphasis added) (quoting United States v. Ashley, 876 F.2d 1069, 1074 (1st Cir. 1989)); see also United States v. Yeje-Cabrera, 430 F.3d 1, 7 (1st Cir. 2005) Thus, it is not the role of the reviewing judge to second-guess the issuing judge, or to ask whether the reviewing judge would have issued the warrant, but rather to determine if the issuing judge's decision was reasonable.  See United States v. Lopez, 300 F.3d 46, 53 (1st Cir. 2002).

Moreover, the First Circuit has held that, "it is well-settled

---

identifying key drug conspiracy members.  Id. at 54.

that not every failure to comply fully with any requirement provided in Title III necessitates suppression." _Lopez_, 300 F.3d at 56 (quoting _United States v. Escobar-De Jesus_, 187 F.3d 148, 171 (1st Cir. 1999); _see_ _United States v. Cunningham_, 113 F.3d 289 at 293-4; _United States v. Donovan_, 429 U.S. 413, 432-5 (1977); _United States v. Chavez_, 416 U.S. 562, 574-5 (1974). Rather, courts facing this issue should look to whether the alleged violation "frustrates the protective purpose of that statute in a particular case." _Lopez_, 300 F.3d at 56. Furthermore, "[i]n determining whether the order and application are sufficiently particular, the papers as a whole must be considered, including especially those portions which recite facts intended to establish probable cause." _Tortorello_, 480 F.2d at 780; _See_ _United States v. Spillone_, 879 F.2d 514, 517 (9th Cir. 1989)("We must look to the entire order to determine if it complies with the statute"). Moreover, the scope of judicial review "is limited to the four corners of the [wiretap] affidavit." _United States v. Nelson-Rodriguez_, 319 F.3d 12, 33 n.3 (1st Cir. 2003).

**B.  The Facts Set Forth Applications Were More than Minimally Adequate to Support the District Court's Determination That Section 2518(1)(c)'S Requirements Had Been Met**

Applying these standards of review, there is no basis to suppress the wiretap. Over the course of ten months, law enforcement agents made numerous undercover buys from "Sonny," but were never able to deal with him face-to-face. Instead, it became

clear that "Sonny" conducted his heroin business over the
telephone. On each occasion, the undercover agent would call
"Sonny." Instead of "Sonny" showing up to deliver the heroin, one
of his workers/runners delivered the heroin.

Defendant first argues that there is nothing in the affidavit
to explain why the undercover agents could not have increased the
amount of heroin they were purchasing from "Sonny" to 'open up the
chance to deal with Offarill on a more intimate level.'
(Defendant's Motion at 12-13). Along the same argument, defendant
further opines that these two undercover agents were in a position
to increase their involvement in Ofarill's organization.
(Defendant's Motion at 14). The argument is not only factually
wrong, but ignores the First Circuit's rule of review: a
commonsense approach.

At page 39, paragraph 77, the affidavit states:

> Although undercover DEA Task Force Agents have been able
> to make controlled purchases of heroin from OFARRILL's
> runners/employees, it is unlikely that these controlled
> purchases will ultimately reveal OFARRILL's sources of
> supply, the possible relationship between OFARRILL and
> CRUZ, or the manner in which OFARRILL launders his drug
> proceeds. Instead, the undercover TFA's have only been
> able to view OFARRILL's organization from the position of
> a street level heroin customer. Furthermore, although
> undercover TFA's have been making controlled purchases of
> heroin from OFARRILL from July 2004 to January 2005,
> these TFA have not been able to see, or deal with,
> OFARRILL directly in an undercover capacity. This is
> because OFARRILL has insulated himself by sending runners
> to make the heroin transactions for him.

As stated above, the UC agents were posing as street level heroin

customers.  The most amount of heroin they purchased at any one time was 30 grams.  The investigation established that Ofarrill/FIGUEROA had insulated himself by sending drug runners to deliver the heroin.  See Lopez, 300 F.3d at 54 (upholding wiretap affidavit which "documents specific incidents suggesting that the further use of surveillance and undercover operations risked revealing the investigation and placing law enforcement officers in harm's way").

Defendant's second argument is that despite three prior failed attempts at conducting a controlled deliver of heroin utilizing CS-2, there was nothing in the affidavit to suggest that CS-2 would not have been offered a fourth opportunity to transport heroin for Gustavo Mejia and "Jhonny" (ORTIZ-PEREZ). (Defendant's Motion at 13).  This argument again avoids the specific facts set forth in the affidavit.  Even if law enforcement agents had been successful in conducting a controlled delivery of heroin, according to the affidavit, CS-2 had no information regarding any type of illicit relationship between "Jhonny" and "Sonny," did not know "Sonny," and failed to identify a photograph of "Sonny." (Pg 27, ¶47). Instead, the only information law enforcement agents had was that "Jhonny" and "Sonny" were in contact over the telephone.

**C.    The Goals of the Investigation Were Reasonable Drawn and the Authorization of the Interception of the Ofarrill Target Telephone**

Moreover, the government's stated goals of the investigation

27

were reasonable and permissible under the law.  To be sure, the government cannot simply set investigative goals that by their very nature are designed to bypass normal tools of investigation in favor electronic surveillance.  See United States v. Blackmon, 273 F.3d 1204, 1211 (9th Cir. 2001) (noting that "[t}he government may not cast its investigative net so far and so wide as to manufacture necessity in all circumstances").  However, the goals of the investigation were neither impossibly broad nor unrealistic.

The fact remains that the major goals of the investigation were legitimate goals, even if they are often the legitimate goals of other investigations of a drug trafficking conspiracy.  See, e.g., United States v. Rivera-Rosario , 300 F.3d 1, 19 (1 st Cir. 2002) (wiretap necessary to identify "conspiracy's members and the supplier of its drugs," as well as to reveal "organizational structure of the drug conspiracy"); Lopez, 300 F.3d at 53-54 (necessity established where traditional methods failed to establish the identity of some conspirators, particularly those at top, and cooperating sources had limited information concerning "full scope of the conspiracy"); United States v. Garcia, 232 F.3d 1309, 1316 (10th Cir. 2001) ("wiretaps were necessary to reveal the full scope the conspiracy and to identify [the defendant's] suppliers").  The Affidavit in this case did not contain "boilerplate assertions [that] are unsupported by specific facts relevant to the particular circumstances of this case and would be true of most if not all narcotics investigations." Blackmon, 273 at 1210.

28

Even assuming *arguendo* that it were true that the goals of the investigation *might* have been achieved by use of normal investigative means, that does not make them impermissible. Title III only requires that the government set forth what efforts it has taken (or considered taking) in achieving the goals of its investigation, and explain why those efforts have failed or are reasonably unlikely to succeed. <u>See</u>, <u>e.g.</u>, <u>United States v. Castillo-Garcia</u>, 117 F.3d 1179, 1187 (10th Cir. 1997) ("the government may obtain a wiretapping warrant without trying *any* other method of investigation, if it demonstrates that normal investigatory techniques reasonably appear to be unlikely to succeed if tried, or to be too dangerous to try") (citations omitted) (emphasis in original); <u>Ramirez-Encarnacion</u>, 291 F.3d at 1222, n. 1 (overruling <u>Castillo-Garcia</u> only to the extent that it had ruled on the standard of review on appeal). Accordingly, the stated goals of the investigation were not so broad that they amounted to a "general warrant."

**D.    Defendant Lacks "Standing" to Contest Any Interception of Wire Communications over the MORALES Target Telephone Since He Was Not an "Aggrieved Party" During MORALES Wiretap**

The standing requirements of Title III are "'to be construed in accordance with the standing requirements usually applied to suppression claims under the Fourth Amendment'" and, therefore, named targets of electronic surveillance who were not actually intercepted lack standing to move to suppress. <u>United States v. Ruggiero</u>, 928 F.2d 1289 (2d Cir. 1991); <u>United States v. Charles</u>, 1998 WL 204696 (D. Mass.); <u>United States v. Salemme</u>, 91 F. Supp.2d

141 (D. Mass. 1999). "Generally, to establish standing the movant must show that (1) he was a party to the communication, (2) the wiretap efforts were directed at him, or (3) the interception took place on his premises." United States v. Faulkner, 439 F.3d 1221, 1223 (10TH Cir. 2006), citing United States v. Apple, 915 F.2d 899, 905 (4th Cir.1990).

The statutory mechanism to challenge the validity of wiretap orders is found in Section 2518(10)(a) which provides that only an "aggrieved person" is entitled to move to the suppress the contents of wiretap communications. Section 2510(11) defines an "aggrieved person" as one "who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."

During the course of the wire interception over the MORALES Target Telephone, which began on March 21, 2005, defendant ORTIZ-PEREZ was not intercepted and was not named as a target subject or interceptee. Defendant was also arrested on March 21, 2005. Therefore, despite defendant's assertions, defendant does not have standing to content any wire communications on the MORALES Target Telephone.

**E.    Under the "Independent Source" Doctrine, the Evidence of Seizure of Heroin on March 21, 2005 Is Admissible Because There Was Probable Cause Independent of the Wiretap Evidence**

Under the "independent source doctrine," even if police engage in illegal investigatory activities, evidence will be admissible if it is discovered through a source independent of the illegality. Murray v. United States, 487 U.S. 533, 537 (1988); see also Nix v.

<u>Williams</u>, 467 U.S. 431, 443 (1984).  The principle behind this doctrine is that although the government should not profit from its misconduct, it also should not be made worse off than it would have been had the misconduct not occurred.  <u>Id</u>. at 537; <u>see</u> <u>United States v. Almonte</u>, 952 F.2d 20, 23 (1st Cir. 1991)(search warrant upheld when no mention was made of prior illegal entry in warrant application); <u>United States v. Veillette</u>, 778 F.2d 899, 903-04 (1st Cir. 1985)(evidence admissible because search warrant application contained sufficient independent evidence to support probable cause).

In this case, the search of the white Toyota Previa van where the heroin was found was conducted after MSP trooper Kane consented consent to search the vehicle and a drug dog alerted to the presence of drugs inside the car. <u>See</u> <u>United States v. Carter</u>, 300 F.3d 415, 422 (4th Cir. 2002)(per curiam)(probable cause to search defendant's trunk after sniff dog alerted to contraband; alert was sufficiently close to trunk); <u>United States v. Cedano-Arellano</u>, 332 F.3d 568, 573 (9th Cir. 2003)(per curiam)(probable cause to search defendant's gas tank after narcotics dog alerted to presence of drugs); <u>United States v. Watts</u>, 329 F.3d 1282, 1286 (11th Cir. 2003)(probable cause to conduct warrantless search based on multiple positive alerts given to officers by drug dogs). Therefore, even assuming *arguenedo* that the wiretap should be suppressed, the seizure of the heroin is admissible because it was obtained through an independent source: the consent of the driver of the vehicle and the dog alert.

III.    <u>CONCLUSION</u>

Accordingly, for the reasons stated above, defendant's motion to suppress the wiretap evidence should be denied in its' entirety.


Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney


By:   /s/ *Neil J. Gallagher*

Neil J. Gallagher
Assistant U.S. Attorney
(617) 748-3397


Dated: May 15, 2006

32

<u>Certificate of Service</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and mailed to all those not participating in ECF.

<u>/s/ Neil J. Gallagher, Jr.</u>
Neil J. Gallagher, Jr.

33